## JACOB MUSSINA *v.* W. ALLING et als.

An action for the revindication of immovables is a real action, and an action to compel a conveyance of lands falls within this category.

The State courts of Lonisiana have no jurisdiction to compel a conveyance of lands situated in Texas—and, *by the Court:*  When the plaintiff entered into a Texas partnership in Texas land claims, he impliedly submitted himself to the Texas laws and tribunals.  His attempt to bring those titles before the courts of Louisiana for adjudication, either directly or indirectly, is not to be favored, as it is not necessary for the due enforcement of our own laws, nor for the suppression of fraud within our borders.  Aside from matters confided to the Federol Government by its Constitution, the relation of the States of this Union, *inter se,* is that of foreign States in close amity. Each is sovereign in its proper domain.  If we would secure respect for our own sovereignty, we should pay respect to the sovereignty of others

Plaintiff claims to have been a joint owner with two of the defendants of certain lands in Texas. He charged a combination of his co-defendants to defraud him of his interest in those lands, and brought this suit for damages resulting therefrom.  But *held* that, so far as the record disclosed, there was a title paramount to that under which plaintiff claimed.  *Held, also,* that there was no proof that he was entitled to damages.

THIS case was tried by a jury before the Fourth District Court of New Orleans, *Reynolds,* J.   *Wolfe & Singleton, Roselius* and *Duncan,* for plaintiff.  *H. D. Ogden, R. Hunt* and *Bonford,* for defendants and appellants.

SPOFFORD, J.  This suit was instituted in the Fourth District Court of New Orleans, on the 1st of November, 1851.

The plaintiff, *Jacob Mussina,* describes himself as a resident of Louisiana, and the four defendants, *Stillman, Belden, Basse* and *Hord,* as citizens of Texas; the other defendant, *Alling,* being a citizen of Louisiana.

The leading allegations of the petition are the following:

That the plaintiff, together with two of the defendants, *Stillman* and *Belden,* on the 9th of December, 1848, entered into a written contract, by which they agreed to hold jointly certain land titles intended to cover the town called Brownsville, situated on the Rio Grande, in the State of Texas, the interest of the parties to be in the following proportions: *Stillman* one-half, *Belden* one-fourth, and *Mussina* one-fourth; that the defendant *Alling,* (who was the partner of *Belden,* in the firm of *Belden & Co.,* trading at Brownsville,) was secretly interested with *Belden* in this contract of the 9th of December, 1848, or shortly afterwards became so; that *Stillwell, Belden,* and the petitioner, (constituting the Brownsville Town Company,) employed the defendants, *Basse & Hord,* as attorneys at law in relation to their land speculations aforesaid, and that *Basse & Hord* continued to act in that capacity, as well as in the capacity of agents for the company, up to the —— day of December, 1849, when *Stillman, Belden, Basse* and *Hord,* aided and abetted by *Alling,* combined and entered into a conspiracy to defraud the plaintiff out of his just rights, under the agreement of the 9th of December, 1848, and to slander him and his titles

to the property embraced in the agreement, with a view of crippling his resources, &c.

That, on the 14th December, 1849, *Stillman* and *Belden* sold out to *Basse & Hord*, all their own interest, *as well as that of the petitioner*, under the said agreement, for the pretended price of $15,000; that, owing to the fiduciary relations between the parties, it was not competent for *Stillman* and *Belden* to sell, nor for *Basse & Hord* to buy, so as to defeat the rights of the plaintiff; but, as he deems it for his advantage to adopt this purchase, he does so, and claims to be the beneficiary thereof and the rightful owner of the whole property thus purchased by *Basse & Hord*, subject to the obligations by them contracted in the several deeds now of record.

That the property included in the partnership agreement, at the time of the said sale, was worth $300,000, and that *Basse* and *Hord*, and *Stillman* and *Belden* before them, had made large sales and realized $136,000, which they had fraudulently appropriated and refused to account for.

That the defendant, *Alling*, had aided and abetted *Basse & Hord* in effecting sales under their said purchase, slandered the petitioner's title, and warranted the titles of *Basse & Hord*.

That the value of the Brownsville property had been impaired by the fraudulent sale to *Basse & Hord*.

That *Basse & Hord* were insolvent, and wholly irresponsible for the amount of property thus thrown into their hands.

That *Alling* and *Belden*, on the 5th of January, 1851, for the price of one dollar, accepted a title from *Basse & Hord*, to a valuable piece of property, included in the agreement of the 9th of December, 1848, and now have possession of the same, with a view to defraud the plaintiff.

That *Stillman* also accepted their title to another valuable piece of the same property, for one dollar, with the same fraudulent intent.

That all the defendants had conspired to secrete certain maps of the Brownsville property, which were originally intrusted by the Company to *Basse & Hord*, as attorneys.

That the petitioner being somewhat embarrassed, as was confidentially known by *Stillman*, *Basse* and *Hord*, and having purchased an interest in some lands in Texas, about Point Isabel, for which he was unable to pay, consulted with the defendant *Hord*, under whose advice a deed of trust was drawn up, upon his interest in the Brownsville property, to secure his vendors for the price of the Point Isabel property, in the sum of $28,750. *Hord* being the trustee and advising the beneficiaries, who also were his clients, on the 20th of October, 1849, when the deed was made, that *Mussina's* interest in Brownsville was a sufficient security for that amount.

That there was pending in the United States District Court at Galveston, Texas, a suit entitled *Cavazos et al.* v. *Stillman et al.*, in which the title of *Stillman*, *Belden* and *Mussina*, was contested, and an adverse title set up; that *Basse & Hord* were employed, among other counsel, for *Stillman*, *Belden* and *Mussina*, in that case, and had neglected to take the testimony proper to sustain the defense; that *Hord* had been made a witness in the cause, and had testified, that since the institution of the suit, he had purchased the entire interest of *Stillman* and *Belden*, two of the defendants, and was also interested in favor of the establishment of the old title which he was called to

72

prove up; that this double employment in favor of the complainants and defendants was a betrayal of professional trust and a fraud upon the parties; that *Basse & Hord* had made a collusive agreement with the complainants, *Cavazos and wife*, by which the subject-matter of the suit had been compromised on an agreement to divide the property, which was in fraud of the petitioner's right; that *Alling, Belden* and *Stillman*, further conspiring with *Basse & Hord*, on the 26th of February, 1851, caused an amended answer to be filed for *Stillman* and *Belden*, in the said Chancery suit, denying that the plaintiff *Mussina* had any title in the town site of Brownsville, and averring that *Stillman* owned three-fourths, and *Belden* one-fourth of the whole.

That *Simon Mussina* was the plaintiff's agent in all the Brownsville matters, and had full knowledge of all the frauds practised by the defendants.

Upon these allegations the plaintiff, in his original petition, asked that *Alling* and *Belden* be condemned to make him a title of the property they bought of *Basse & Hord*, for the price of one dollar, and to account for the revenues, and in default thereof to pay him $12,000; that *Alling, Stillman, Basse & Hord*, be condemned to convey to him, by good and sufficient title, all the property included in the contract of 9th December, 1848, and acquired by subsequent purchase under the said contract, as well as all the property acquired by either of the said parties in fraud of the petitioner's rights, and that in default of so doing, they be condemned, *in solido*, to pay him $300,000 *in the way of damages;* there was also a prayer for general relief.

*Alling* was cited in New Orleans, the place of his domicil.

*Belden, Basse* and *Hord*, casually found in New Orleans, were cited there.

*Stillman* has not been cited, nor has he made an appearance in the cause.

All the parties who were brought into court, excepted to the jurisdiction *in limine litis.*

They averred that the demand on its face was in the nature of a petitory action, for lands lying in the State of Texas, where all but one of the defendant's reside; that the action is therefore local, and cannot be maintained in the State Courts of Louisiana.

This plea being overruled, the parties answered, still protesting against the jurisdiction, and reserving all their rights under the exceptions filed.

Nearly a year after the institution of his suit, the plaintiff presented a supplemental petition, asking the court to take it as an amendment and addition to the prayer of his original petition, and that, besides the relief already sought, it should be decreed that *Stillman* make the plaintiff a title to the property he bought of *Basse & Hord* for one dollar, and to account for the revenues, and further that all the defendants be condemned, *in solido*, to pay him $75,000 *in damages* for the wrongs, injuries, &c., growing out of the fraudulent combination and conspiracy of the said defendant, against him, as set forth in the original petition.

The supplemental petition was not put at issue by default or answer.

One *Antonio Longorie*, a citizen of Mexico, intervened in the suit, praying leave to join the plaintiffs in seeking to compel the defendants to make a conveyance of the real estate described in the petition, and in procuring a recognition of the title of *Jacob Mussina*, on the alleged ground that *Mussina* had conveyed the said property to him in trust for the vendors of the *Point Isabel* property, upon which the sum of $25,750 was said to be still due by the plaintiff. *Longorie*, as trustee, further prayed judgment for the said sum of

$28,750, and that the land described in the plaintiff's petition be sold to satisfy said claim by privilege and preference, &c.

This petition in intervention was served upon the plaintiff's attorney and upon the defendant *Alling* only, but does not appear to have been put at issue.

At the plaintiff's instance the cause was tried by a jury.

The trial appears to have occupied about ten days, the evidence being voluminous and complicated. The records of several suits in the courts of Texas, touching various titles and claims to the lands in question, form a portion of the evidence.

The jury rendered a verdict in the following form :

We, the jury, find that the defendants shall convey unto *Jacob Mussina*, the plaintiff, by good and sufficient title, all the rights of property acquired by *Basse & Hord*, under the transfer of conveyances of the 14th December, 1849, and 31st January, 1850, within ninety days from the date hereof, and that *Elisha Basse, R. H. Hord, S. A. Belden* and *W. Alling*, pay to the plaintiff the sum of $25,000 damages. We, the jury, further find that *S. A. Belden* and *W. Alling* convey to *J. Mussina* the property purchased by them from *Basse & Hord* on the 5th January, 1851, and, on the said defendants complying with the above, the said plaintiff shall refund the said amounts advanced by defendants for the purchase of the property, and in default of the defendants making the above conveyances within ninety days, we, the jury, find in favor of the plaintiff, *J. Mussina*, for the sum of $214,000, in lieu of the title to the property."

A judgment was rendered pursuant to this verdict, and the District Judge having overruled the motion for a new trial, offered by the defendants, the latter appealed.

In this court the plaintiff has joined in the appeal, averring that there is error in the judgment to his prejudice, and that upon finding the issues of fact in favor of the appellee, he is entitled upon the proofs and pleadings to a judgment *in solido* against the defendants, for the amount claimed in the petition, and supplemental petition, to wit: $375,000. Wherefore, he prays that the judgment of the court below be so amended as to give him an absolute judgment for $375,000, and without prejudice to any equitable lien he may have upon the lands in controversy, and that the judgment so amended be affirmed with costs."

The first question to be discussed is the question of jurisdiction.

So far as the action may be styled a real action, we think that the State Courts of Louisiana have no jurisdiction over it. An action for the revendication of immovables is a real action. C. P. 4. And an action to compel a conveyance of lands, falls within this category.

It is true the English Court of Chancery, in the exercise of its peculiar power over the consciences of parties, served with its *subpœna*, has indirectly assumed a jurisdiction touching real property situated abroad. But even there, it is believed that the cases generally will be found limited to a widely different state of facts from that which is presented by the record before us, to wit : that the parties defendant reside within the jurisdiction, that the land to be affected by the decree is under the dominion of the crown, and that, without the interposition of Chancery, there must be a failure of justice.

The courts of the United States which have been invested with chancery

MUSSINA
v.
AILING.

jurisdiction have borrowed their doctrine and their practice from English precedents.

The case of *Massie* v. *Watts*, 6 Cranch, 157, relied upon by the plaintiff was a case from the United States Circuit Court of Kentucky against a defendant resident there; the land incidentally affected was situated in Ohio, but the question concerned the location of certain titles emanating from the Government of the United States; and the case was within the peculiar province of equity, not remediable at law.

These circumstances would hardly make the case of *Massie* v. *Watts* a precedent to support the jurisdiction of the Fourth District Court of New Orleans in the present controversy concerning land titles in Texas, even if that court had been endowed by the Legislature with chancery powers.

But the people of Louisiana have always resisted the encroachments of foreign modes of procedure, and especially the peculiar doctrines and forms of chancery.

After the Act of Congress of the 26th May, 1824, it was reluctantly admitted that the federal courts sitting in Louisiana had equity powers technically so called, and the question divided the Supreme Court of the United States. *Livingston* v. *Story*, 9 Peters, 652.

We find no warrant in our law and no justification in principle or necessity, for importing into our simple system of remedies one of the most subtle doctrines by which the chancellors of England extended their jurisdiction and aggrandized their power, a doctrine which, if carried into effect here without the limitations already alluded to, might occupy the courts of New Orleans with investigation of land titles all round the world.

True, our State courts may be said to have, both common law and equity jurisdiction in this sense, that they are generally competent to afford such relief, to parties and in cases properly before them, as may be demanded in a judicial proceeding, either at law or in chancery, in those States which recognize the English division of remedies. But it does not follow that all of the prerogatives claimed by courts of common law and courts of chancery, and all their artificial rules and peculiar dogmas should be usurped by the courts of Louisiana.

The case of *McDowel* v. *Reed*, 3 Ann. 391, has been cited as an authority in point. We do not find it so. That case was long held under advisement, and the decree was a very guarded one; in the decree we are to look for the character of the precedent.

The cause was remanded to ascertain if the garnishee, resident in New Orleans, had money in his hands, the proceeds of certain lands and slaves in Mississippi, which, by a contract made in New Orleans, had been conveyed to him in trust, with power to sell for the benefit of certain preferred creditors of the grantor, who was the defendant in execution, and to the prejudice of the complainant who resorted to the garnishee process. The court only intimated by its judgment, that if the garnishee had money in his hands, the proceeds of this arrangement made in Louisiana between citizens of Louisiana, in violation or in fraud of her laws, he should not be protected by his own reprobated contract from paying it over to the seizing creditor.

No other case has been cited from our reports to show that it was competent for the District Court to decree that the defendants should make the plaintiff a title to lands in the State of Texas.

The plaintiff, however, who succeeded in the court below in procuring a judgment for the land, almost in the words of the prayer of his petition, has chosen in this court to complain of that portion of the judgment, to drop the demand for a conveyance, and to ask an absolute judgment for $375,000 in damages.

When we consider that the gravamen of the complaint is the divestiture of title to lands in another State and their depreciation, by means of a conspiracy concocted there between persons resident there, it might well be doubted whether the incidental and subsidiary prayer for damages, which is now for the first time made the principal and indeed the only prayer, changed the legal aspect of the question of jurisdiction presented by the exceptions taken and overruled *in limine.* It has been said by high authority that if a court has no jurisdiction of a principal question it has none of its consequences and incidents. Per Kent C. J. in the *matter of Ferguson,* 9 John. 239. See also as to local actions for land, and damages to real estate. Vattel's Law of Nations, B. II, Ch. VIII, § 103, Story's Conf. Laws, § 543 et seq. *Rogers* v. *Woodbury,* 15 Pick. 156. *Livingston* v. *Jefferson,* 1 Brosch. 203. *Howard* v. *Ingersoll,* 23d Ala., 673.

But we do not find it necessary to decide the case wholly upon this ground. For, assuming (according to the oral argument pressed upon us at bar on behalf of the plaintiff) that where two things are prayed for, one within and the other without the sphere of its jurisdiction, the court must listen to the former prayer, and assuming also that we have a right to hear and determine the case upon the simple demand for damages, as if the action were transitory, still, we are compelled to say, after a diligent examination of the entire record, that the plaintiff has not furnished the means of a conjectural approach towards justice between the parties at present, by any judgment for damages whatever.

It may be that the plaintiff has suffered much, it may be that he has suffered not at all.

But, in controversies growing out of joint speculations in real estate, it is not upon wild conjecture that courts of justice should undertake to assess a specific amount of damages.

Such is the volume of the record and such the multiplicity of points both of fact and laws litigated between the parties, that we can only indicate a few of the numerous obstacles which render it impossible to do justice here and now, and which impose upon these litigants the necessity of postponing their controversy about damages, until the main question of title in its complicated bearings shall have been disposed of in the forum and by the law of the place *rei sitæ.*

The plaintiff in asking for damages assumes that the Brownsville Company absolutely owned the town of Brownsville; whereas they only owned certain pretensions of doubtful validity under which they took possession.

The revolutions of seventy years had covered the town site with various conflicting claims flowing from the various governments under whose empire the territory along the eastern bank of Rio Grande had successively passed.

One of these pretended titles emanated from the city of Matamoros on the opposite side of the river. Most of the lands in question were once a part of the *ejidos,* or town commons, granted to that city by the Congress of the State of Tamaulipas. The ayuntamiento of Matamoros parcelled out this portion of

their municipal domain in *labors*, or small farms, to tenants from amongst their own citizens. These farmers thus acquired an inferior and mongrel sort of title, somewhat analogous to that conferred on the lessee by the emphytentical lease of the civil law. The direct dominion remained either in the city of Matamoros or in the sovereign ; the useful dominion passed to the occupant of the *labor* subject however to various burdens and conditions. These *labor* titles formed one class of claims which attracted the attention of speculators covetous of acquiring a speedy fortune, many of whom anticipated that Brownsville would become a thriving city, when the American army left that neigborhood, after the successful termination of the late war with Mexico.

But some thought that such claims would not be respected by the courts, and contended that the superior title of the city of Matamoros vested in the State of Texas, by the event of war, as that State had declared in 1836, when she was a Republic, that her jurisdiction extended westward to the Rio Grande, and now that boundary was acknowledged. The partisans of this theory supposed that these lands, having *de jure* constituted a part of the public domain of Texas ever since the legislative declaration of 1836, and *de facto* since the military occupation in 1846, had for some time been subject to entry under Texas scrip and head-right certificates, some of which had been thus located by one *David Snively* since the occupation of the country by the United States troops.

In 1848, the defendant *Stillman*, a man of wealth, residing there, made investments in both classes of claims with the view of building up a town. He bought *labors* from *Zamora* and the two *Velas*, and scrip located by *Snively* to the amount of 4,676 acres, and employed surveyors who proceeded to lay out the town in lots.

*Simon Mussina*, the plaintiff's brother, and editor of a newspaper in Brownsville, having heard of *Stillman's* operations and intentions, proposed a partnership with him in speculating in Brownsville titles. As an inducement he held out the fact that he could control some more *labors*, in which he had been offered an interest by the farmers for the aid he might give them in forwarding their pretensions; he also professed some skill in Mexican titles. The negotiation of *Simon Mussina* with *Stillman* resulted in the wrrtten agreement of the 9th December, 1848, which is the main foundation of the plaintiff's case as presented in his petition. For some reason which does not very clearly appear, *Simon* put the name of his brother *Jacob* into the partnership, acting himself as his agent, the plaintiff never having been upon the Rio Grande.

The contract purports to be made between *Stillman*, *Belden* and *Jacob Mussina*, and binds them to hold jointly all *labors* of land which they or either of them had purchased or might thereafter purchase within what is termed the *ejidos* of Matamoros on the left bank of the Rio Grande, embracing the town of Brownsville, as also all locations and rights under Texas certificates or land scrip situated within the aforesaid *ejidos;* they also agreed that, *after all liabilities should be settled* the *profits* resulting from the sale of lands should be divided according to their respective shares in the partnership (to wit : *Stillman* ½, *Belden* ¼ and *Mussina* ¼) all losses and expenses to be divided in the same ratio.

The company thus constituted sold some lots, chiefly on a credit, giving bonds for title, or actual titles, with the warranty of the company; and for some time lots were in demand, *Basse & Hord* acting as the agents of the company in making sales.

But the lots owed their value, not to the intrinsic worth of titles derived from Mexican *labor* tenants, or from Texas scrip locations, but mainly to the warranty of *Stillman* and *Belden* who were residents of the country and in good credit.

It is amply proved that *Jacob Mussina* of New Orleans was insolvent, and it would seem that his brother and agent, who testifies that he was equally interested with him in all his operations upon the Rio Grande, was not in much better condition.

It appears that the warranty of *Mussina*, an insolvent absentee, added nothing to the value of the lots.

Directly after the company commenced operations, their claims under the *labor* settlements and scrip locations were assailed by an ancient title descending from the Spanish crown.

On the 12th January, 1849, or less than five weeks after the partnership contract was signed, *Cavajos and wife* and various other persons representing themselves as the heirs of the original grantee *Don Jose Salvador de la Garza*, asserted their title dating back to the year 1781, by instituting a suit for the lands in question against *Stillman, Belden et als.*, in the United States District Court for the District of Texas.

At this time *Mussina* was unquestionably indebted to the company for his share of the expenses, and it is not surprising that his partners, encountering a law-suit at the outset, should have demanded a contribution from him. He appears to have gained time, and induced them to postpone their demand, by a proposal of his agent *Simon*, who, on the 12th January, 1849, addressed a letter to *Stillman* inclosing some Texas land certificates, which he estimated at $1,540 and which he requested *Stillman* to hold "as collateral for advances made in the purchase of Brownsville."

The plaintiff avers in his petition, that he entered into the agreement of 9th December, 1848, in good faith, and has fully discharged all the duties and obligations that devolved upon him under it: he assumed the affirmative of that issue; but the letter above referred to, as well as the testimony of his agent called by the defendant to testify against his interest, show that he did not contribute his quota to the joint expenses of a hazardous enterprize. The same testimony indicates that he contended for a point which would have wrought injustice towards his partners, viz: that the sale of lots should go on under the warranty of the company (which as we have stated derived its value from the names of *Stillman* and *Belden*) and that the proceeds should be divided among the partners before the titles were finally tested at law.

As the collaterals were afterwards returned to the plaintiff and he has not to this day paid a contribution, the judgment for $375,000 which he seeks would be a clear gain, with no valuable consideration other than the time spared by *Simon Mussina* from his editorial duties in attendance upon the courts and correspondence about the titles.

So embarrassed was *Simon Mussina* in October 1849, that he availed himself of his agency for his brother to mortgage his interest in Brownsville, to some of his own creditors by a deed of trust.

In the following December *Stillman* and *Belden* sold out to the defendants, *Basse & Hord*, who were agents of the town company. This sale of the 14th Dec., 1849, does not purport to convey to *Basse & Hord* the interest of *Mussina*. But a dispute had arisen as to what that interest was under the circum-

MUSSINA
v.
ALLING.

stances then existing. *Stillman* and *Belden* insisted that he had forfeited all rights under the contract by failing to contribute to the expenses or to the responsibility of the partnership. He contended that he was not bound to contribute, and that the profits of the speculation would pay his share of the expenses incurred. It would appear that just before the sale of the 14th December, *Simon Mussina* had some difference with *Basse & Hord* about another matter, to wit: the advice they had given their clients, *Simon Mussina's* creditors, relative to the registry of the deed of trust, just mentioned, upon the *Mussina* interest in Brownsville, executed on the 24th October, 1849, in which *Hord* was appointed trustee. The result was that another trustee was substituted to *Hord*, on the 15th December, 1849.

The purchase by *Basse & Hord*, two days afterwards, of the interest of *Stillman* and *Belden* would seem to have aggravated the dissensions which had grown out of *Mussina's* alleged failure to contribute to the expenses of the company.

On the 28th January, 1850, the scrip deposited as collateral for advances was returned to *Simon Mussina*, and *Stillman* and *Belden* gave public notice that all business connection between them and *Jacob Mussina* had ceased on account of his failure to comply with his engagements.

On the 30th January, *Simon Mussina* having come to an open quarrel with *Basse & Hord* also, wrote a formal notice for the press in the following words: "All authority vested by me in *Elisha Basse* and *Robert H. Hord*, of the firm of *Basse & Hord*, to act as my agents or attorneys in the affairs of the Brownsville Town Company, as also all other matters and things whatever, has been revoked. (Signed) *Jacob Mussina*, p. p. *Simon Mussina*."

The next day, Jan. 31st, 1850, *Stillman* and *Belden* executed the recognitive act to *Basse & Hord*, in which, for the first time, they appear to have warranted the latter against the claim of *Mussina*.

Six weeks afterwards, *Jacob Mussina* filed a bill of complaint in the United States District Court for the District of Texas, against *Stillman, Belden, Basse, Hord*, and one *George Lyon*, setting forth many of the allegations of the petition in this case, but averring the property sold by *Stillman* and *Belden* to *Basse & Hord* to be worth more than $50,000, and the moneys collected for the sale of lots to be about $20,000 in cash and about $10,000 in notes; certain interrogatories were propounded to the defendants, and, besides the prayer for a discovery, the following specific relief was asked: that all the pretended purchases of *Basse & Hord* from *Stillman* and *Belden* might be adjudged and decreed to have been made by *Basse & Hord* as the trustees of the complainant, and that, as his trustees, they should account and surrender to him all lands, notes, moneys, credits, bonds and obligations, together with all maps, plats, surveys and title papers received from *Stillman* and *Belden*, and that the petitioner be subrogated to the place and stead of *Basse & Hord*, in respect to the property, etc., received by them under the conveyances of the 14th December, 1849, and 31st January, 1850, upon compliance on his part with the terms conceded by *Stillman* and *Belden* to *Basse & Hord;* there was a further prayer that the defendants be compelled to account to the petitioner for all sales of lots and other receipts.

This bill was met by a demurrer, but, so far as the record informs us, it is still pending in the United States Court for the district of Texas.

In the court below, *Belden* pleaded the pendency of this suit by way of exception, and the same plea is set up in the answer of *Basse & Hord*.

The amendment asked for by the appellee in this court, as stated in his brief, reduces the case to a question of damages; it is said that the land is no longer in controversy here.

But the land is in controversy in Texas between the same parties, *Alling* alone excepted. How can we guage the damages, until we know what the Texas tribunal will do with the plaintiff's suit for the land there? A judgment in his favor simply for damages here will not bar the claim for specific relief pending there. And if his legal position be correct, that by reason of their former employment as agents and attorneys of the company, the purchase by *Basse &
Hord* of the three-fourths interest of *Stillman* and *Belden* enured to his benefit, (a point which it is for the Texas tribunal, already possessed of that controversy, to determine,) and if his allegations about the value of the company's claims be also correct, he will turn out to be a gainer by the alleged frauds practiced by his former partners and the partnership attorneys, and we should not give him an additional reward in damages.

And as to the proceeds of lots sold, the present petition is not so framed as to call for a liquidation of the partnership. The plaintiff's bill in equity, pending in Texas, has called the defendants to account for these matters, and there, at the domicil of the partnership, it is proper they should be adjusted. If there were any evidence before us (which there is not) to show the amounts received, they are still liable to be refunded to the vendees and warrantees of the company, should their titles not prevail, and, by the terms of the partnership, nothing is to be distributed till all liabilities shall have been settled.

The depreciation in the value of lots which is complained of, is also an incidental question. The evidence shows that this was owing rather to commercial depression, a diminished population, and the clouds of adverse titles that thickened over the company's claims, than to the quarrel between the partners and the denial of *Mussina's* interest. Besides, if the plaintiff is not yet entitled to the lots or their value, he is not entitled to damages for their depreciation.

We now return to the *Cavazos* suit, in which the *De la Garza* title was asserted against the defendants, *Stillman* and *Belden*, to which suit *Jacob Mussina* voluntarily made himself a party, and which resulted in a decree recognizing that title as paramount.

The inconsistent positions taken by the plaintiff with regard to this decree have contributed to our embarrassment in the case.

He first contends that the decree is void for want of jurisdiction, and then claims in argument a large amount of additional damages, not charged in any of his pleadings, because, as he avers, that decree defrauds him of the Point Isabel tract of land bought in the name of *Simon Mussina*.

It is difficult to see how a decree, void for lack of jurisdiction, can have destroyed a title not in contestation in the suit.

From *Mussina*, who volunteered an appearance, the denial of jurisdiction, *ratione personæ*, cannot be heard. And it is plain that the court had jurisdiction of the subject-matter of the suit. If other parties should have been made, it does not follow that the decree is void as between the parties that were made. Can the plaintiff claim damages for this decree, which he has not sought to set aside by any of the direct modes known to the practice of the Texas or the United States tribunals?

We do not pretend to say that the decree was right. But *Mussina*, present in court by his separate counsel, as well as by his agent, contested the case,

73

with full knowledge of all the material facts which he now sets up collaterally in avoidance of the decree.

*Basse & Hord* never appeared as his attorneys in that case. They appeared only as the attorneys of *Stillman* and *Belden,* and of some of the *De la Garza* heirs who were made plaintiffs without authority, and who retired from that position. If *Basse & Hord* were ever the attorneys of *Jacob Mussina,* individually, of which we do not find satisfactory proof, they were, as we have seen, publicly discharged on the 30th January, 1850,—more than a year before the *Cavazos* suit was tried. More than a year before the trial *Mussina* knew that they had bought out *Stillman* and *Belden* and that the latter subsequently warranted them against his interest in the Brownsville titles. He thus dealt with them on the *Cavazos* trial at arm's length, and he had no longer a right to rely upon them to look after his interest in that suit. On the record his interest was denied by his former partners. On the other hand he instructed his special attorneys, before the termination of the suit, to take such steps in the further proceedings as would establish his title to the whole site of Brownsville. *Simon Mussina,* the plaintiff's agent, was present and made an affidavit on the trial. He is alleged to have been cognizant of all the frauds practised by the defendants, to have been skilled in Mexican titles, and to have devoted much time and labor to travelling and attending to law suits for the plaintiff.

Now, the plaintiff's petition in the present cause was filed after the trial but before the rendition of the decree in the *Cavazos* suit. He seemed to have anticipated that the decree must go against his interests, for he makes it matter of special complaint in the petition, that the procurement of the testimony to prove and maintain the title of the defendants in the *Cavazos* suit was intrusted mainly to *R. H. Hord,* and that he neglected to take at Brownsville and elsewhere the necessary depositions to prove up and maintain the rights of the defence, and especially the adverse possession of the defendant and their grantors.

If there was any neglect, the plaintiff must charge it upon his agent and counsel and not upon his adversaries.

But it is said that the decree was procured upon the testimony of *Hord,* an interested party. This does not appear, for the other evidence is not before us nor are any reasons for the judgment given. Were the fact so, still *Mussina* had the power to object, and did object to the competency of the witness, who, on his *voir dire,* openly avowed his interest in both the contending titles. *Mussina* was not deceived on the trial. If the judge ruled incorrectly in admitting *Hord* to testify, or gave undue weight to his testimony, those are matters for revision upon appeal, but they do not authorize us to override the decree as a mere nullity.

Again, it is said that because *Basse & Hord* were the agents and attorneys of the Brownsville Town Company, their purchase of the *Cavazos* title must be held to enure to the benefit of *Mussina,* and so he must be the beneficiary of the fraudulent decree.

It does not appear that *Basse & Hord* contracted for the purchase of the *Cavazos* claim until some time after the 30th January, 1850, when the plaintiff discharged them from all employment on his behalf.

It is a question, for the courts of Texas to determine, whether the plaintiff has acquired the *Cavazos* title by reason of the previous relations of *Basse & Hord* towards the Town Company, and their subsequent purchase from the heirs of *De la Garza.*

. Again, we are asked to treat the old *De la Garza* grants as stale and fraudu-lent, although it was sustained by the *Cavazos* decree, to which the plaintiff was a party. If the judgment were out of the way we have not the information which would enable us to take such a responsibility. This grant always excited the serious apprehensions of the company, and it would seem that the plaintiff, or his agent, had even bought an interest under another portion of the same grant in August, 1849. The *Cavazos* claim was one of the obstacles to the success of the company, rendering the direct warranty of *Stillman* and *Belden* necessary to the sale of lots.

But it was not the only trouble encountered by the holders of the *labor* claims and scrip locations.

The State of Texas ignored their pretensions, and assumed to have succeeded to the paramount title of Matamoras and of Mexico on the 19th December, 1836, when she declared her boundry on the west to be the Rio Grande. She assumed, moreover, that the *ejidos* thus acquired, finally confirmed to her by the result of war, had not fallen into the general mass of her vacant lands, and that none of her laws had subjected them to be entered by scrip or head right certificates.

Accordingly, on the 24th January, 1850, by an Act of the Legislature incor-porating the city of Brownsville, she donated the *ejidos*, in controversy, to the city itself in trust for certain public charities enumerated in the charter. This formidable claim must have been discussed for some weeks before it matured into a legislative grant, and it is but reasonable to suppose that the prospect of encountering it was one of the inducements of *Stillman* and *Belden* to make the sale of the 14th December, 1849.

It is true the Act incorporating Brownsville was subsequently repealed. But thereupon the District Attorney filed an information in the proper court to provide for the conservation and execution of the trusts ; and the court, holding that the repeal of the city charter did not operate a revocation of the charities, and adopt-ing the equitable doctrine that trusts shall never fail for want of a trustee, ordered and decreed that two new trustees be appointed to carry out the bene-volent purposes of the Legislature in the administration and sale of the property. This decision is not technically binding on the adverse claimants, as *Simon Mus-sina* testifies, because the proceedings were, in form, *ex parte*. But, in reality, *Basse & Hord* were heard as *amici curiæ* in opposition to the motion of the Dis-trict Attorney, as the holders of two anterior titles. Their pretensions, both under the Town Company and the *De la Garza* grant, are discussed at length in the learned opinion of the District Judge before whom the information was tried, and were there pronounced inferior to the title conveyed by Texas to the charitable uses aforesaid.

The testimony of *Simon Mussina* also points to another adverse claim, as likely to be asserted by the city of Matamoras, perhaps on the ground that her municipal possessions on this side of the Rio Grande could no more be divested by the events of war than those of any private owner.

The only property the company ever had, being thus beset by actual and impending litigation, the plaintiff would be fortunate, if by resorting to an ac-tion of damages in another State, he could exchange his conditional one-fourth interest in the Snively scrip locations and Mexican *labor* pretensions, for any absolute judgment for the value of the whole of Brownsville. He would thus escape, what were otherwise inevitable, the ordeal of a Texas war of titles, and the contingency of eviction.

But, to give him the judgment he seeks, we must assume that, by the laws of Texas, the fraudulent attempt charged upon his adversaries to deprive him of his one-fourth interest in the partnership, has so far redounded to his advantage, as to invest him with his partners' three-fourths, and not only so, but to make all the defendants his warrantors, that the partnership claims to the Brownsville town site, bought as an experiment and menaced on every side by hostile titles, some of which have been already successfully asserted in the Texas courts, were, nevertheless, perfect and indefeasible. We must pronounce the De la Garza grant to be stale and fraudulent; the Texas donation to the Brownsville charities to be an empty pretence, and the idea of an undivested interest still remaining in the city of Matamoras, to be preposterous. *Non nostrûm tantus componeri litis.* The courts of Texas must, in the first instance, settle these disputed titles to lands within their jurisdiction, and the demand for damages, if it could ever properly be entertained in the courts of Louisiana, is at least premature in the present stage of the business, and this for causes quite independent of the alleged frauds of the respondents.

If the charge of defeating the plaintiff's interest in the partnership of December 9th, 1848, by a fraudulent conspiracy were true, the intrinsic damages would be the amount he invested in the partnership; but he invested nothing. The resulting damages would be the amount of profits of which he has been deprived. But the profits would be nothing and the losses great and sure, if either of the rival titles should prove paramount to those purchased by the company. That such is likely to be the case, may reasonably be inferred, not only from the records in evidence, but from the fact that *Basse & Hord*, notwithstanding the brilliant acquisitions of which it is said they have robbed the plaintiff, are proven by his witnesses to be as insolvent as before.

So much upon the hypothesis that the plaintiff's interest in the town titles has been destroyed by the machinations of the defendants. We would not be understood to intimate that that interest can have been so destroyed. The plaintiff's title, such as it is, has been of record in the proper office of the county of Cameron, where the land lies, ever since the 18th of May, 1849, and we see no obstacles to the vindication of his rights in the courts of the locality. Indeed, his only adequate and complete remedy is there. We are not permitted to entertain a doubt of the ability or disposition of the courts of a sister State, to mete out justice to those who seek it in the right way.

When the plaintiff entered into a Texas partnership in Texas land claims, he impliedly submitted himself to the Texas laws and tribunals. His attempt to bring those titles before the courts of Louisiana for adjudication, either directly or indirectly, is not to be favored, as it is not necessary for the due enforcement of our own laws, nor for the suppression of fraud within our borders. Aside from matters confided to the Federal Government by its Constitution, the relation of the States of this Union *inter se* is that of foreign States in close amity. Each is sovereign in its proper domain. If we would secure respect for our own sovereignty, we should respect the sovereignty of others.

In so far as the residence of the defendant *Alling*, exempts him from the operation of some of the principles herein announced, it may be added, that the same difficulties which are at present in the way of even an approximative estimate of damages as against the principal offenders, apply to him, who is charged as an aider and abettor.

We also deem it proper to say, that the evidence which tends to show that he is liable *in solido* for the acts of his co-defendants in Texas, appears to us to be slight and inconclusive.

It is therefore ordered and decreed, that the judgment of the District Court be avoided and reversed, and that the plaintiff's demands be dismissed, as in case of non-suit. It is further ordered and decreed, that the plaintiff pay costs in both courts.

MERRICK, C. J. I concur in the judgment in this case, on the ground that there is in the record no sufficient evidence on which to base a decree in favor of the plaintiff.

The uncertainty which rests upon the titles, in regard to which the judgment of this court is sought, is so great, that in my opinion, it precludes, for the present at least, any safe estimate of damages. The judgment of nonsuit, therefore, receives my concurrence.

BUCHANAN, J. (concurring). The plaintiff's case was presented to the court below, upon an alternative prayer for the conveyance of the title to land, or for damages.

Before this court, the former alternative is abandoned, and the prayer for damages alone remains.

This claim for damages reposes essentially and indispensably upon an assumption that plaintiff, on the 9th December, 1848, and subsequently, was owner of an undivided fourth of certain lands situated in Cameron County, Texas, by titles derived from the State of Texas, and from the city of Matamoras.

These titles have been the subject of contestation in a suit in equity in the District Court of the United States, for the District of Texas, having Circuit Court powers; and by final decree of that court, rendered in January 1852, have been declared null and of no effect.

The plaintiff was a party defendant to that suit, having filed his appearance and answer on the 9th July, 1849, and was specially named in the decree.

He instituted the present action on the 1st November, 1851, pending the suit in equity in the Federal Court in Texas, and his petition alleges the pendency of said suit, and certain alleged fraudulent and collusive proceedings of some of the defendants (who were engaged in the suit in equity, either as defendants or solicitors,) touching the defence of that suit, as grounds for damages.

To sum up briefly. In November, 1851, whilst a suit in the nature of what we would call a petitory action for land, instituted by third persons, claiming under an adverse title, was pending against the present plaintiff as well as the present defendants, in a court of competent jurisdiction, in the State (Texas) where the land is situated, the present plaintiff cited his co-defendants in the said petitory action, before a Louisiana tribunal, and demands that the title be here settled in his favor, in the absence of those parties who were plaintiffs in the petitory action, and who might be (and as the result of that action has shown, are,) the true owners of the land. This is a change of venue which I think inadmissible. The action of the Federal Court, in Texas, could not thus be forestalled by that of the Louisiana tribunals.

I do not lose sight of the argument of one of the learned Counsel of plaintiff, that the concession of the fact that plaintiff has lost the land by the judgment of the United States Court, in Texas, does not exclude a claim for

MUSSINA
*v.*
ALLING.

damages against a party by whose frauds that judgment may have been brought about. But upon this point I observe, first, that there was no judgment in Texas when this suit was instituted, and, therefore, the cause of action supposed had not yet arisen. And, secondly, an inspection of the record of the Texas suit, shows that the plaintiffs, in that suit, claimed under a grant from the Spanish Crown, in 1781, and that *Mussina, Belden* and *Stillman*, claimed under titles from the city of Matamoras, dated 1834 to 1844, and under titles from the State of Texas, dated in 1847 and 1848. The judgment of the United States Court, in Texas, declares the Spanish grant to be the older and superior title; and annuls, by particular reference, so far as they conflict, with the Spanish grant, each and every title held by *Mussina, Belden* and *Stillman*. There is no allegation either in the equity suit in Texas nor in the present suit, that the Spanish title was a fraudulent one; and no matter how negligent, or even how fraudulent may have been the conduct of plaintiff's partners, or of the other defendants in the management of the Texas law suit, or of the other transactions connected with their joint speculations in lands, in and around Brownsville, it is manifest that plaintiff's eviction from those lands was *damnum absque injuriá*, unless upon the hypothesis that the Espiritu Santo grant was an inferior title to that held by *Mussina* and his partners. Upon that point, the judgment of the court, in Texas, has concluded the plaintiff. At all events, the question is not re-examinable in this court.

*R. N. Ogden & Leovy*, for a re-hearing:

Having but recently been employed to assist the counsel of the plaintiff in his application for a rehearing, we feel great diffidence in attempting to impugn an opinion so elaborate as that pronounced in this case.

The first question treated by the court is that of jurisdiction, and to that we first respectfully invite a reëxamination. After a condensed statement of what the court considered " the leading allegations of the petition," the opinion states that " all the parties who were brought into court, excepted to the jurisdiction *in limine litis*. They averred that the demand on its face, was in the nature of a petitory action for lands lying in the State of Texas, where all but one of the defendants reside; that the action is therefore local, and cannot be maintained in the State courts of Louisiana." The validity of this plea must depend upon the nature of the demand contained in the petition.

The opinion says, that so far as the action "may be styled a real action, we think that the State courts of Louisiana have no jurisdiction on it. An action for the reveridication of immovables is a real action, (C. P. 4,) and an action to compel a conveyance of lands falls within this category."

It must be in reference to this demand, to these allegations, and to the plea interposed against them *in limine litis*, that these observations of the court are to be applied. They cannot be applied to any suggestions contained in the answer to the merits filed after this plea was overruled. If this plea had been sustained, the petition would have been dismissed, and none of the matters contained in the answer to the merits, would have found their way to the attention of this court. Acting on an appeal from a decision so rendered, your attention would have been confined to the petition and the plea. In this manner only, we most respectfully suggest, is this question now to be investigated, without reference either to allegations of the answer, or proofs in the cause. How far the defendants are at liberty to set up any questions of disputed title, and thus embarrass the true issues in this cause; and how far such defence is supported by the proofs, are questions for future consideration in connection with the merits, but they are manifestly foreign to the present inquiry, which must rest for its solution on a sound application of precedents and principles to the original issue presented by the petition and the plea.

Can this be properly "styled a real action," or "an action for the revendication of immovables," in the language of the opinion; or as the defendants express it in their plea, " a petitory action for lands."

We respectfully think not.

In such actions the primary object is always the recovery of the thing. In this the primary object is redess for an injury, and the relief sought is in damages, unless the defendant chooses to accept the alternative presented to him, of surrendering the thing fraudulently withheld. Over such an action, there can be no doubt of the jurisdiction of our courts. That the power of our courts to do justice in such cases, is not restrained by the consideration that their decree may affect lands situated beyond their jurisdiction, is well settled by decisions of this court. In *McDowell et als.* v. *Read et als.* it was held that

"Where a court is called upon to enforce a right, it may avail itself of its jurisdiction over the person, to do justice relative to a subject-matter beyond its jurisdiction, though lands be affected by the decree." 3 Ann. 391. See *Copely* v. *Berry et als.* 12 Rob. 80.

Is not this case precisely the case supposed by Chief Justice Marshall, in the case of *Massie* v. *Watts*, 6 Cranch, 148, "where the defendant in the original action is liable to the plaintiff, either in consequence of contract, or as trustee, or as the holder of a legal title acquired by any species of *mala fides* practiced on the plaintiff." In such case, this great Judge said, "the principles of equity give a court jurisdiction wherever the person may be found, and the circumstance that a question of title may be involved in the inquiry, and may even constitute the essential point on which the case depends, does not seem sufficient to arrest that jurisdiction."

This case is so directly in point, that we must pray to be excused for expressing some surprise at its not having been regarded by this Honorable Court as of controling authority.

The view taken of it in the opinion, is expressed as follows:

"The case of *Massie* v. *Watts*, 6 Cranch, 157, relied upon by the plaintiff, was a case from the United States Circut Court of Kentucky, against a defendant residing there; the land incidentally effected was situated in Ohio, but the question concerned the location of certain titles emanating from the government of the United States, and the case was within the peculiar province of equity, and not remediable at law."

From this, we think, it must be inferred that, in the opinion of this court, one of the material grounds on which the jurisdiction was sustained, was, that "the question concerned the location of certain titles emanating from the government of the United States," and that in such a case, by reason of the subject-matter of the suit, the courts of the United States would have jurisdiction, without regard to the situation of the land. If such a ground of jurisdiction existed, it was conclusive, and superceded the necessity of referring to any other. It would hardly have escaped the luminous mind of Chief Justice Marshall, or the notice of his associates.

Yet, we find no allusion to it, as an element in the question of jurisdiction. On the contrary, the decision rests upon the general principles of equity jurisprudence, and not upon any special authority of the Federal Judiciary. After stating the case, and citing minutely the leading English precedents, it concludes in these words: "Upon the authority of these cases, and of others which are to be found in the books, as well as upon general principles, this court is of opinion that, in a case of fraud, of trust or of contract, the jurisdiction of a Court of Chancery is sustainable wherever the person be found, although lands not within the jurisdiction of that court, may be effected by the decree."

Nottingham said, in the case of *Anglasse* v. *Muschamp*, 1 Vernon, page 75, "the defendant residing in England, having fraudulently obtained a rent charge on lands lying in Ireland, a bill was brought in England to set it aside.

"To an objection made to the jurisdiction of the court, the Chancellor replied, 'this is surely only a jest put upon the jurisdiction of this court by the common lawyers; for when you go about to bind the lands and grant a sequestration to execute a decree, then they readily tell you that the authority of the court is only to regulate a man's conscience, and ought not to affect the estate, but that this court must agree *in personam* only; and when, as in this case, you prosecute the person for a fraud, they tell you that you must not intermeddle here, because the fraud, though committed here, concerns lands that lie in Ireland, which makes the jurisdiction local, and so wholly elude the jurisdiction of this court.' The Chancellor, in that case, sustained his jurisdiction on principle, and on the authority of *Archer* v. *Preston*, in which case a

contract made respecting lands in Ireland, the title to which depended on an act of settlement, was enforced in England, although the defendant was a resident of Ireland, and had only made a casual visit to England. On a rehearing before Lord Keeper North, this decree was affirmed.

"In the case of the *Earl of Kildars* v. *Sir Maurice Eustace* and *Fitzgerland*, 1 Vernon, 419, it was determined, that if the trustee live in England, the Chancellor may enforce the trust, although the lands lie in Ireland.

"In the case of *Toller* v. *Coteret*, 2 Vernon, 494, a bill was sustained for the foreclosure of a mortgage of lands lying out of the jurisdiction of the court, the person of the mortgagee being within it.

"Subsequent to these decisions was the case of *Penn* v. *Lord Baltimore*, 1 Vernon, 449, in which the specific performance of a contract for lands lying in North America was decreed in England.

"Upon the authority of these cases, and of others which are to be found in the books, as well as upon general principles, this court is of opinion that in a case of fraud, of trust, or of contract, the jurisdiction ·of a Court of Chancery, is sustainable wherever the person be found, although lands not within the jurisdiction of that court may be affected by the decree.

"The inquiry, therefore, will be, whether this be an unmixed question of title, or a case of fraud, trust or contract."

The question of jurisdiction might be safely rested here; but its importance induces us to call the attention of the court to a few additional authorities on the point.

"The principles thus laid down apply with the same force, where the equitable obligation in question has its origin in the contract of the defendant, as when it originated in a wrongful disregard on his part of the antecedent equity of the complainant. It is, therefore, well settled, that a contract for the sale of land will be specially enforced against a defendant within the jurisdiction of the court, although the land itself may be without it. The law was so held in the cases of *Fairley* v. *Shippen*, Wythe's Ch. Cases, and *Guerrant* v. *Fowler*, 1 Hen. & Mumford, 4, before the decision in *Massie & Watts*, and since ·then in *Shattuck* v. *Cassidy*, 3 Edwards, 152, and seems to be now too well settled for controversy. In *Ward* v. *Arredondo*, Hopkins, 213, the doctrine that rights growing out of contract are not tied down to any special locality, was applied under circumstances somewhat peculiar, and where the parties to the contract were beyond the reach of the court, as well as the property, to which the contract related. The defendants, who reside at Havana, had agreed to sell land to the complainants, who were residents of New York, and had actually sent a conveyance of the property, which was returned for some informality in its execution. The mistake was corrected, and the deed placed in the hands of defendants' agent in New York, but with directions not to deliver it to the complainant, unless on the payment of a sum of money in addition to that stipulated for in the original contract. Under these circumstances, the court sustained a bill for an injunction to prevent the agent from returning the deed to the defendants, and to compel him to deliver it to the plaintiffs in execution of the contract."

The decisions above cited were fully sustained in the recent case of *De Klyn* v. *Watkins*, 3 Sandford, 185, where it was held, that when land which had been obtained by fraud from the complainant, was sold to a subsequent purchaser with notice of the fraud, the purchase would be set aside, and a reconveyance directed, although the land lay beyond the jurisdiction of the court.

"The general principle, that the performance of equitable obligations will be enforced, without regard to the situation of the property, to which they relate, was applied in the case of *Mitchell* v. *Bunch*, 2 Paige, 606, by deciding that equity would compel the discovery of assets fraudulently concealed and withheld by a debtor, and their application to the payment of his debts, although consisting of lands in another State." White & Tudor's Leading Cases in Equity, p. 324, *et seq.*

"Although the property of a defendant is beyond the reach of the court, so that it can neither be sequestered nor taken in execution, the court does not lose its jurisdiction in relation to that property, provided the person of the defendant is within the jurisdiction. By the ordinary course of proceeding, the defendant may be compelled either to bring the property in dispute, or to which the complainant claims an equitable title, within the jurisdiction of the court; or to execute such a conveyance or transfer thereof, as will be suffi-

cient to vest the legal title, as well as the possession of the property, according to the *lex loci rei sitæ.*"  Ibid, p. 325.

"Although the question, how far the courts of our country are authorized to proceed against foreigners temporarily within their jurisdiction, in relation to contracts made in another country, has been frequently raised, it appears now to be well settled, both in this State and in England, that they have jurisdiction to enforce the performance of such contracts, where the party proceeded against is within the jurisdiction of the court. And it makes no difference whether the defendant is actually domiciled here, or is temporarily within the jurisdiction at the time of the service of the process to appear and answer the plaintiff's demand. *Sicard* v. *Whale,* 11 John. R. 194, *Peck* v. *Hozier & Mulock,* 14 id. 346; *Smith* v. *Spinola,* 2 id. 198; *Imley* v. *Ellessen,* 2 East's Reports, 453. Neither is this practice of entertaining suits against, or between foreigners, of recent origin, or confined to the courts of this country and of England. By referring to the digest, it will be found that the courts of Rome not only took cognizance of suits between foreigners, but that a Judge was specially authorized to discharge that duty. White & Tudor's Leading Cases in Equity, p. 326.

"In general, the fact that the property is not within the jurisdiction constitutes no bar to a proceeding in a court of equity, if the person is within the jurisdiction, for a court of equity acts upon the person, or, to use the appropriate phrase, *æquitas agit in personam.*"  Story Eq. Pl. §489.

The opinion says: "It is true the English Court of Chancery, in the exercise of its peculiar power over the consciences of parties served with its subpœna, has indirectly assumed a jurisdiction touching real property situated abroad; but, even then, it is believed that the cases generally will be found limited to a widely different state of facts from that which is presented by the record before us, to wit: that the parties defendant reside within the jurisdiction; that the land to be affected by the decree is under the domion of the crown; and that, without the interposition of Chancery, there must be a failure of justice.

"The courts of the United States which have been invested with Chancery jurisdiction have borrowed their doctrine and their practice from English precedents.""

We have shown that neither in England nor in the United States does the jurisdiction of a Court of Chancery depend upon the residence of the defendant. In the case of *Massie* v. *Watts,* the language is: "the jurisdiction of a Court of Chancery is sustainable whenever the person be found."

In *Archer* v. *Preston,* "a contract respecting lands in Ireland was enforced in England, although the defendant was a resident of Ireland, and had only made a casual visit to England. In several English and American cases we have cited from White and Tudor, vol. 2, part 2, p. 326, it was held to make "no difference whether the defendant is actually domiciled here, or is temporarily within the jurisdiction at the time of the service of the process to appear and answer the plaintiff's demand. In this respect, then, there is certainly no difference between those cases, in which the English and American courts have taken jurisdiction, and the case before the court. As to the second ground of difference, "that the land to be affected by the decree is under the dominion of the crown," which, in another part of this opinion, is applied to the States of this Union, as being, except in their federal relations, "foreign States in close amity," each sovereign, and bound to respect the sovereignty of each, we respectfully suggest that in no English or American decision which we have been able to find, is the question placed upon that ground. In those quoted, it is put upon the jurisdiction of the court, and not upon the power of the sovereign. In the case of *Massie* v. *Watts,* it was admitted that if the case involved "a naked question of title, the jurisdiction of the Circuit Court of Kentucky would not be sustained," and yet the lands lay within the dominion of the general government. In the English cases, the land was situated beyond the jurisdiction of the court, but clearly within the dominions of the crown, and yet the jurisdiction was supported on the general power of the court to act upon the person, without the slightest allusion to the situation of the lands as within the dominions of the crown. As to the third ground of difference, "that without the interposition of Chancery there must be a failure of justice," we respectfully think it constitutes no difference, because our courts are courts of equity as well as courts of law.

74

MUSSINA
*v.*
ALLING.

But the leading opinion, after commenting upon the decision of the Supreme Court of the United States, which we have quoted, proceeds to say: "These circumstances would hardly make the case of *Massie* v. *Watts*, a precedent to support the jurisdiction of the Fourth District Court of New Orleans, in the present controversy concerning land titles in Texas, even if that court had been endowed by the Legislature with chancery powers. But the people of Louisiana have always resisted the encroachments of foreign modes of procedure, and especially the peculiar doctrine and forms of chancery.

"After the Act of Congress of the 26th May, 1824, it was reluctantly admitted that the federal courts sitting in Louisiana had equity powers, technically so called, and the question divided the Supreme Court of the United States. *Livingston* v. *Story*, 9 Peters, 652.

"We find no warrant in our law, and no justification in principle or necessity, for imparting in our simple system of remedies one of the most subtle doctrines by which the Chancellors of England extended their jurisdiction and aggrandized their powers; a doctrine which, if carried into effect here, without the limitations already alluded to, might occupy the courts of New Orleans with the investigation of land titles all round the world.

"True our State courts may be said to have both common law and equity jurisdiction in this sense, that they are generally competent to afford such relief to parties, and in cases properly before them, as may be demanded in a judicial proceeding, either at law or in chancery, in those States which recognize the English division of remedies. But it does not follow that all the prerogatives claimed by courts of common law and courts of chancery, and all their artificial rules and peculiar dogmas, should be usurped by the courts of Louisiana."

We respectfully suggest that this passage contains errors, which have unconsciously influenced the conclusions of the opinion. The true question presented is not one of practice but of jurisdiction; not by what rules and modes of procedure our courts shall act, but whether they have the powner to act at all; not whether the "artificial rules and peculiar dogmas" of an English Court of Chancery should be "imported into our simple system of remedies," but whether our courts possess equity jurisdiction, and are competent to administer relief under our simple system of petition and answer.

The case of *Massie* v. *Watts*, we respectfully suggest, was authority to show what is a proper case for equitable relief, and so far as its facts are analogous to those of this case, it was a precedent. Supposing this to be such a case, and that the Fourth District Court was competent to afford equitable relief, we respectfully ask whether the authority of that case, and the English and American decisions we have cited, should not be considered safe guides in leading you to the conclusion that its jurisdiction over the person, arising from the nature of the case, was not restrained by the locality of the lands which might be affected by its decree.

That our courts possess full and complete equitable powers cannot be questioned. See Hennen's Digest, p. 466.

Although it may be that "the people of Louisiana have always resisted the encroachments of foreign modes of procedure, and especially the peculiar doctrines and forms of chancery," yet we are not aware that they have ever contended that our courts were not invested with full powers to enable them to do justice. The lawyers of Louisiana have always maintained that our courts were fully competent to afford equitable relief in all cases. Case of *Livingston* v. *Story*, 9 Peters, 652.

Assuming, then, that the court below had full jurisdiction, and was authorized by our laws to administer the relief sought, we proceed to other portions of the opinion, connected with the merits, which we. respectfully suggest may require revision, the inquiry is, how far the plaintiff's case, as stated in his petition, is supported. At the threshold of this inquiry, it must be borne in mind that the case is not presented to this court as an original one, but as an appeal from the verdict of a jury sanctioned by the court of the first instance, that the case was one of damages for fraud, breach of trust, violation of contract, conflicting proof, one, therefore, peculiarly of the province of the jury, and in which this honorable court has been heretofore in the habit of attaching great weight to their verdict, the doctrine of this court, as collected from numerous decisions, is thus stated in Hennen's Digest, vol. 1, page 94:

"When the evidence is contradictory, the verdict of the jury upon questions of fraud and simulation, the assessment of damages, the credibility of witnesses, and other matters of fact peculiarly within its province, will not be disturbed unless manifestly erroneous."

We respectfully ask if there is not error in the views taken of the relative position of the parties, which have had a material influence on the decision. The opinion says, the plaintiff and defendants, *Stillman* and *Belden* entered into an agreement on the 9th of December, 1848, "to hold jointly certain land titles intended to cover the town called Brownsville, etc."

It further says: "The plaintiff, in asking for damages, assumes that the Brownsville Company absolutely owned the town of Brownsville, whereas they only owned certain pretensions of doubtful validity, under which they took possession."

We contend that the defendants stood in such relation to the plaintiff by their original agreements, and by their repeated recognition of his rights, and of the completeness of the title, and they cannot be permitted to set up, as a defence to this suit, any questions of disputed title, or to embarrass this case with any inquiry into title.

The contract of the 9th December, (to be found at p. 127 of the record, and on p. 2 of the original brief,) and the acknowledgments and recognitions of title, to which we shall now beg leave to refer your honors, as found in both record and original brief, prove, we most respectfully think, that the parties agreed to hold, not mere "land titles," but *lands ;* not mere titles, "intended to cover the town called Brownsville," but the land itself on which the town then stood. Not "mere pretensions of doubtful validity under which they took possession," but the land itself, of which they had the peaceable, open, notorious and quiet possession, under titles perfect in all respects, derived from persons who had similar possessions, during a period sufficient to cover all defects by the ægis of prescription. And we further contend, that the fiduciary relations in which defendants stood towards the plaintiff forbade such a defence to this action.

We respectfully consider that it is clearly established that *Basse & Hord* acted throughout as the attorneys-at-law and as the agents both of the Brownsville Company and its individual members, in all matters connected with these lands, and as the attorneys-at-law of *Jacob Mussina* individually, in relation to certain other lands.

And we submit to the court, whether the defendants can be permitted to set up, as a defence to this suit, the condition of the titles to these lands, and lead the court into an investigation of those titles; whether in so doing they do not lead us away from the true issues in the cause; and whether such a defence can lay in their mouth.

It would be admitted that a defaulting teller of a bank, who had absconded with the funds of the bank, and invested them in the purchase of lands, in his own name, in the island of Cuba, could not be permitted, if found here and brought personally into one of our courts, at the civil suit of the bank, claiming damages for his acts of embezzlement, and offering to take from him a conveyance of the land bought with their funds, in lieu of damages, to set up as a defence that the titles to these lands were defective and imperfect, and lead the court into an investigation of their validity. Suppose a lawyer or agent, charged by one of our citizens with the defence of his title to real estate in San Francisco, and put into possession of his title deeds and means of defence, should betray his trust and acquire a title in himself to such real estate, and hold it adversely to his client, could he, when made personally amenable to the jurisdiction of one of our courts, in a suit like the present, be permitted to plead in defence that the titles were defective and the lands in litigation? The same principles which exclude such defence in those cases, ought, we conceive, to exclude it in the case stated in the petition, and supported as it is shown in proof.

If, however, we are to be led, in this case, into an investigation of the character and validity of these titles, we think they will be found, on a closer examination, to be of higher dignity and perfection than they are represented to be in this opinion. It says:

"The *Ayuntamiento* of Matamoras parceled out this portion of their municipal domain in *labors*, or small farms, to tenants from amongst their own citizens; these farmers acquired an inferior and mongrel sort of title, somewhat

MUSSINA
v.
ALLING.

analogous to that conferred on the lessee by the emphyteutical lease of the civil law."

Respectfully contending that the rights conferred by these labor titles were more extensive than those "conferred on the lessee by the emphyteutical lease of the civil law," let us for a moment examine them on the supposition of their analogy.

The emphyteusis is described by *Mackeldey*, as the real right by which a person is entitled to enjoy another's estate as if it were his own, on condition of cultivating and improving it, and paying, at certain periods, a certain tax or rent therefor. That although the emphyteuta does not become the owner of the thing, yet he has nearly all the rights of an owner. That he has the full right of enjoyment, consequently the right of possessing the thing and of reaping all the fruits thereof; that he has the right of disposing of the thing itself, by sale, on giving notice to the *dominus* or owner, who must, within two months from such notice, exercise or waive his right of preëmption.

"The grant of an emphyteusis," he says, "is usually founded on a contract. As this contract confers upon the emphyteuta a sort of ownership, it was regarded by many Roman jurists in the light of a contract of sale; but, as on the other hand, it requires the payment of a yearly rent, others regarded it as a contract of hiring. This controversy among the Roman jurists, respecting the nature of the emphyteutical contract, was settled by the Emperor Zeno, who decided that it was neither one nor the other, but an independent consensual contract."

It originated in the custom of the Romans to divide conquered lands among the citizens and soldiers, subject to the superior ownership of the State, and bound to the payment of a rent to the *ærarium* (treasury,) and "it being difficult to find a willing tenant for lands lying waste and uncultivated, or one who would be inclined to expend the necessary labor and capital to bring under cultivation land in which he had no permanent right, and to pay rent for it without some prospect of an adequate return, to obviate this difficulty and to promote agriculture, the rights of the tenants of waste lands were extended as far as possible, so as to give him a sort of ownership." "This expedient had great effect in encouraging persons to undertake to reduce such lands to cultivation; and afterwards municipal and ecclesiastical corporations also let out lands belonging to them, in a manner similar to emphyteusis."

The title of the emphyteuta descended at his death to his heirs, unless he had disposed of it by will.

Viewed, then, in the light of such a title, so nearly approaching to complete ownership, and only subject to be defeated by the non-performance of conditions subsequent, what did it become when the performance of those conditions were rendered impossible by a change of sovereignty effected by conquest and treaty.

He was so far owner, that he could alienate *inter vivos* or *mortis causa*, could mortgage the land or burthen it with servitudes without the consent of the *dominus*. As a means of enforcing his rights, he had the action *rei vindicatio utilis* against every possessor, including even the proprietor himself. Besides paying the rent and improving the property, he had to bear all the public burdens and taxes imposed upon it. Although he was bound to pay the rent *(canon)* agreed upon at the time specified, and without any previous demand, yet "he did not forfeit his right *ipso jure* by a non-performance of his duties, but only through an action brought by the proprietor."

From what is shown in this record, this labor title seems to be an absolute grant in fee, liable, however, to be defeated on the non-performance of certain conditions subsequent. The grantee became owner. In many instances he had taken possession of and improved the land before obtaining the grant, and the grant was then made, ratifying his possession and confirming his title as owner. The principal if not the sole condition was, it is believed, the payment of a rent almost nominal. See Doc. Fa., Rec. 303; Doc. Q., Rec. 112.

The lands embraced in these titles were held by the grantees, as their own property, and were mortgaged, sold, seized for debt, transmitted by devise and by descent during a great number of years, and no claim of forfeiture or defeasance was ever made during the existence of the former sovereign. The defendants themselves, we show, treated them as absolute titles, supporting their averments by their oaths.

In the case of *Soulard et als.* v. *the United States*, C. J. Marshall said:

"In the treaty by which Louisiana was acquired, the United States stipulated that the inhabitants of the ceded territory should be protected in the free enjoyment of their property. The United States, as a just nation, regards the stipulation as the avowal of a principle, which would have been held equally sacred, though it had not been inserted in the contract.

"The term 'property' as applied to land, comprehends every species of title, inchoate or complete. It is supposed to embrace those rights which lie in contract, those which are executory as well as those which are executed. In this respect, the relations of the inhabitants to their government is not changed. The new government takes the place of that which has passed away." 4 Peters, 511.

"Conditions subsequent are not favored in law, and are construed strictly, because they tend to destroy estates; and the rigorous execution of them is a species of *summus jus*, and in many cases hardly reconcileable with conscience. If the condition subsequent be possible at the time of making it, and becomes impossible to be complied with, either by the act of God, or of the law, or of the grantor; or if it be impossible at the time of making it, or against law, the estate of the grantee, being once vested, is not thereby divested, but becomes absolute." 4th Kent, 130.

In the *United States* v. *Arredondo et als.* 6 Peters, 745, the Supreme Court says:

"It is an acknowledged rule of law, that if a grant is made on a condition subsequent, and its performance becomes impossible by the act of the grantor, the grant becomes single."

The condition was, that the grantees should establish on the lands two hundred Spanish families. The court says in that case:

"We are not prepared to say that the condition of settling two hundred Spanish families in an American territory has been, or is, possible; the condition was not unreasonable or unjust at the time it was imposed. Its performance would have been deemed a very fair and adequate consideration for the grant, had Florida remained a Spanish province. But to exact its performance after its cession to the United States would be demanding the '*summum jus*' indeed, and enforcing a forfeiture on principles which, if not forbidden by the common law, would be utterly inconsistent with its spirit. If the case required it, we might feel ourselves at all events justified, if not compelled to declare, that the performance of this condition had become impossible by the act of the grantors— the transfer of the territory, the change of government, manners, habits, customs laws, religion, and all the social and political relations of society and of life."

These lands had been severed from the public domain and from the *ejidos*, or commons, and granted by metes and bonds—were so held as property, built upon, improved and cultivated under titles of ownership. Could they, consistently with the principles contained in these cases, and invariably acted upon by the courts of this country, be considered, after the change of government, in any other light than as complete and absolute titles, the duties to the new sovereign in the shape of taxes and other impositions affecting all lands, taking the place of the rent and other impositions of the former sovereign?

Such, then, was the title under which the plaintiff and his associates held their lands, and entered upon their enterprize. That they attempted to fortify it by a purchase of scrip detracted nothing from the value of the title on which they relied, and is a matter of small consequence, which, however, will receive in its proper place a passing remark. The leading opinion says: "Such is the volume of the record, and such the multiplicity of points, both of facts and laws litigated between the parties, that we can only indicate a few of the numerous obstacles which render it impossible to do justice here, and now, and which impose upon these litigants the necessity of postponing their controveray about damages, until the main question of title, in its complicated bearings, shall have been disposed of in forum, and by the law of the place *rei sitæ*."

These "numerous obstacles" are described as "clouds of adverse titles that thickened over the company's claims."

These "adverse titles" are enumerated, and we beg leave to call your honors' attention to them in the order in which they are mentioned in this opinion.

According to the principles settled in the cases above cited, it is clear that the State of Texas did not acquire by "the event of the war" any title to these lands, which were then owned by individuals, subject only, as in the case of *Arredondo*,

to certain conditions subsequent; and consequently, the purchase by *Stillmam* of the Snively scrip locations, was at most only a work of abundant caution to avoid litigation or annoyance. But, however, that may be, it does not present, in this case, any conflict of title, inasmuch, as both the labor titles and the scrip titles were united in the hands of the company. The next adverse title mentioned is the De la Garza grant, which the opinion describes as follows: "Directly after the company commenced operations, these claims under the labor settlement and scrip locations, were assailed by an ancient title, descending from the Spanish crown.

"On the 12th January, 1849, or less than five weeks after the partnership contract was sighed, *Cavazos* and *wife*, and various other persons, representing themselves as the heirs of the original grantee, *Don José De la Garza*, asserted their title, dating back to the year 1781, by instituting a suit for the lands in question, against *Stillman, Belden, et als.*, in the United States District Court of the district of Texas.

"This suit resulted in a final decree, recognizing the De la Garza grant as paramount."

Neither this claim, nor its final recognition as paramount, can, we respectfully contend, form any obstacle to justice in this cause. The *Cavazos* suit, and the final decree rendered in it, are charged in the petition as being a part of the complicated machinery of fraud and conspiracy, by which the plaintiff has been wronged and injured, and it does not now stand in legal contemplation as a conflicting claim against us, because, as is charged and proved, it has been brought in during the pendency of the suit, and before the decree by our agents and trustees, who now claim to be in possession of the property embraced in that decree. What rights these agents and trustees acquired adversly to the plaintiff in this suit, by their arrangements with the complainant in the *Cavazos* suit depends upon their relations and obligations under a contract, and are examinable in this court ; but as a question of disputed title, in which others than the defendants have any interest adverse to the plaintiff, it is forever set at rest by the acts of the defendants themselves.

The next in the enumeration of these adverse titles is described as follows, in the leading opinion, after speaking of the De la Garza claim, and its establishment by a final decree of a competent Texas tribunal:

"But it," the De la Garza claim, " was not the only trouble encountered by the holders of the labor claims and scrip locations. The State of Texas ignored their pretensions, and assumed to have succeeded to the paramount title of Matamoras and of Mexico, on the 19th of December, 1836, when she declared her boundary on the west to be the Rio Grande. She assumed, moreover, that the *ejidos* thus acquired finally confirmed to her, by the result of war, had not fallen into the general mass of the vacant lands, and that none of the laws had subjected them to be entered by scrip, or head-right certificates."

"Accordingly, on the 24th January, 1850, by an Act of the Legislature, incorporating the city of Brownsville, she donated the *ejidos*, in controversy, to the city itself, in trust for certain public charities enumerated in the charter. This formidable claim must have been discussed for some weeks before it matured into a legislative grant; and it is but reasonable to suppose that the prospect of encountering it was one of the inducements of *Stillman* and *Belden* to make the sale of the 14th December, 1849."

"It is true, the Act incorporating Brownsville was subsequently repealed. But thereupon the District Attorney filed an information in the proper court to provide for the conservation and execution of the trusts ; and the court holding that the repeal of the city charter did not operate a revocation of the charities, and adopting the equitable doctrine that trusts shall never fail for want of a trustee, ordered and decreed that two new trustees be appointed to carry out the benevolent purposes of the Legislature, in the administration and sale of the property."

"The decision is not technically binding on the adverse claimants, as *Simon Mussina* testifies, because the proceedings were, in form *ex parte*. But in reality, *Basse & Hord* were heard as *amici curiœ*, in opposition to the motion of the District Attorney, as the holders of two anterior titles. Their pretensions, both under the Town Company and the De la Garza grant, are discussed at length in the learned opinion of the District Judge before whom the information was tried, and were there pronounced inferior to the title conveyed by Texas to the charitable uses aforesaid."

This adverse title can present no serious obstacle, as we respectfully maintain, for several reasons:

First—It is directly at variance with the other claim of the State of Texas first mentioned in this opinion, " that these lands, having *de jure* constituted a part of the public domain of Texas ever since the legislative declaration of 1836, and *de facto* since the military occupation of 1846, had, for some time, been subject to entry under Texas scrip and head-right certificates."

Second—The answer we have given to the first claim, equally applies to this second claim of the State of Texas, to wit: That the lands were private property, and protected by the principles recognized by our courts.

Third—That the attempted donation of the *ejidos*, or commons, to the city of Brownsville, contained in the charter, or act of incorporation, fell to the ground with the repeal of that act.

Fourth—That the *ex parte* decree, here spoken of, was reversed by the Supreme Court of Texas. See *Basse* v. *Fountleroy*, 11 Tex. Reps.

Fifth—That there is no one before this court setting up any such title, nor is it set forth in any of the answers in this suit.

Sixth—As the defendant's counsel, in his brief, page 27, tells us: " The State of Texas formally recognized the De la Garza grant, and relinquished by an Act of the Legislature, approved February 10, 1852, all its right, title and interest in the lands covered by it, to the original grantee, his heirs and assigns."

There remains but one more of the series of adverse titles enumerated in the opinion, and it is thus described:

" The testimony of *Simon Mussina* also points to another adverse claim as likely to be asserted by the city of Matamoras, perhaps on the ground that her municipal possessions on this side of the Rio Grande could no more be divided by the event of war than those of a private owner."

The only testimony of *Simon Mussina* on this subject is in the following words: " Being asked what was the nature of the claim of the city of Matamoras? says: 'The city pretended that it owned the property in fee, and had only leased it to those who had established the labors.'"

This testimony does not " point to" the grounds on which this claim of the city of Matamoras rested. It speaks of it merely as a pretension, and the pretension is evidently unsupported by a shadow of reason. The opinion says: " Perhaps on the ground that her municipal possessions on this side of the Rio Grande could no more be divested by the event of war than those of any private owner." But the protection thrown around private property by the conquering nation was never extended to belligerents ; and the " municipal possessions" of the city of Matamoras could hardly be respected, when the rights of the sovereignty, of which she was herself a creature, had been annihilated.

But the defendants themselves furnish a complete answer to this and to all these pretended titles, so far as they affect the present controversy. Their counsel says, page 27 of his brief, that " the decision in the *Cavazos* case itself, by a court of competent jurisdiction, affirms not only the original validity of the title but determines that the rights of the claimants had not been destroyed by the change of government, forfeiture, or adverse possession, etc."

While we deny the validity of this De la Garza title, and claim the benefit of the defendant's sworn denunciation of it as " stale and fraudulent," and insist that this decree was the result of a fraudulent and collusive conspiracy to injure us, the defendants must be forever estopped by this admission from themselves setting up against us any of the pretended titles which they thus say have been finally set aside in their favor by the decree of a competent tribunal.

We cannot help thinking that this review of the case must disperse these clouds of adverse titles, and that your honors must see that the only one remaining at all deserving of your consideration is the De la Garza grant, now quietly held by our opponents in this cause, who attempt to obstruct your jurisdiction, and to postpone an examination of the plaintiff's claim of damages on the ground of conflict and uncertainty in regard to the title.

If we have succeeded in this, we hope to have removed the difficulties which seem to press upon the minds of the Chief Justice and of Mr. Justice Buchanan in their very guarded concurrence in the decree.

His Honor the Chief Justice says : " I concur in the judgment in this case, on the general ground that there is in the record no sufficient evidence on which to base a decree in favor of the plaintiff. The uncertainty which rests upon the title in regard to which the judgment of this court is sought is so great that, in

Mussina<br>v.<br>Alling.

MUSSINA
v.
ALLING.

my opinion, it precludes, for the present at least, any safe estimate of damages. The judgment of non-suit, therefore, receives my concurrence."

Now it appears that there is no uncertainty as to the title; or, at least, none that the defendants can set up as an obstacle to the plaintiff's claim for damages; and that the only question is whether the title now held by *Basse & Hord*, by virtue of the Texas decree, is in their hands a good defence against this claim for damages.

It is true, as stated by Mr. Justice Buchanan, that there was "no judgment in Texas when this suit was instituted." But plaintiff had alleged in this suit the "fraudulent and collusive proceedings of the defendants touching the defence of that suit;" and, as stated in the leading opinion, had declared in his petition in this suit his anticipation "that the decree must go against his interest," in consequence of those fraudulent and collusive proceedings. The terms in which this charge is made, and this anticipation expressed, are as strong and explicit as language affords.

Although there may be no express allegation in so many words, "either in the equity suit in texas or in this suit, that the title was a fraudulent one," yet we respectfully submit to your honors that such a charge is substantially contained in both, and we have shown that in the answer of *Belden* and others in this suit, the *Cavazos* title was expressly declared to be "stale and fraudulent," and the charge was made under oath.

Lastly, in regard to the foregoing views of Mr. Justice Buchanan, "that the judgment of the court in Texas has concluded the plaintiff," and that "at all events, the question is not reëxaminable in this court," we respectfully conceive that, in this case, your honors are not called upon to override that decree, or to touch it in any respect. So far as the present controversy is concerned, the plaintiff, without admitting its validity or authority, and reserving the right to dispute both on all proper occasions, may well contend that its existence opposes no legal obstacle to his rights or claims in this suit.

It does not deprive this court of the right to determine, under the facts and circumstances of this case, who are the real beneficiaries of that decree, or, as Mr. Justice Buchanan has expressed it, "does not exclude a claim for damages against a party by whose frauds that judgment may have been brought about."

Besides, it is also true that the judgment in the *Cavazos* suit was rendered before the trial of this suit, and the fact was pleaded by the defendant *Alling*, and by him introduced into the cause as evidence, and therefore became a proper element for consideration in this suit. It was proved on the trial, not only without opposition but by the action of the defendants themselves, that the "anticipated" wrong and injury growing out of the fraudulent combinations of the defendants had been actually consummated.

These views seem to us to obviate the objection of the learned Judge that plaintiff is attempting a change of venue, and calling upon this court to settle questions of title to lands which are now pending and at issue "in a court of competent jurisdiction in the State (Texas) where the land is situated," and this, too, "in the absence of those parties who were plaintiffs in the petitory action (in Texas), and who might be, and, as the result of that action has shown, are the true owners of the land."

The plaintiff asks of this honorable court neither decision nor inquiry respecting the rights of the plaintiffs in that Texas suit, nor respecting the validity of the Texas decree. He has not sought to introduce here any litigation as to disputed titles. It has been introduced by his adversaries against his strenuous opposition. He contends that it is not germain to this cause. He opposes its introduction as a defence to his claim of damages, and he asks of this court only to settle the questions of right and justice between the present defendants and himself.

*A. N. Ogden & Stansbury* also filed an elaborate argument for a re-hearing.

Re-hearing refused.